IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Aetna Better Health     :
of Pennsylvania, Inc.,     :
            :
      Petitioner :
            :
     v.      : No. 274 M.D. 2017
            : Argued: October 18, 2017
Commonwealth of Pennsylvania,  :
Department of Human Services,   :
            :
      Respondent :


BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
      HONORABLE ROBERT SIMPSON, Judge
      HONORABLE P. KEVIN BROBSON, Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE ANNE E. COVEY, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE ELLEN CEISLER, Judge[1]


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK        FILED: April 11, 2018


    Aetna Better Health of Pennsylvania, Inc. (Aetna) petitions for review

of the order of the Department of Human Services (Department)[2] denying Aetna's

---

[1] This case was argued before an *en banc* panel of the Court that included former Judge Joseph M. Cosgrove. Because Judge Cosgrove's service on the Court ended January 1, 2018, this matter was submitted on briefs to Judge Ellen Ceisler as a member of the *en banc* panel.

[2] Pursuant to Section 201 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. §61(a), "[t]he executive and administrative work of this Commonwealth shall be performed by the Executive Department, consisting of the . . . Department of Public

bid protests challenging the Department's decision not to select Aetna to progress to agreement negotiations with respect to reissued Request for Proposal No. 06-15 (Reissued RFP) in which the Department sought managed care organizations (MCOs) to provide HealthChoices Physical Health Program (HealthChoices) services to Medical Assistance (MA) beneficiaries.[3]   Also before the Court is

<hr />

Welfare . . . ."  Pursuant to Section 103(a) of the Act of June 13, 1967, P.L. 31, added by the Act of September 24, 2014, P.L. 2458, 62 P.S. §103(a), "[t]he Department of Public Welfare shall be known as the Department of Human Services."

[3] As this Court has explained:

> [The Department], formerly known as the Department of Public Welfare (DPW), is the state agency that administers the Commonwealth's Medicaid program.  "Medicaid is a joint state-federal funded program for [MA] in which the federal government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the state agreed to assume."  [The Department] delivers Medicaid benefits in Pennsylvania through either (1) a "fee for service" payment program, where the provider of care is paid by [the Department] on a claim-by-claim basis; or (2) a "managed care" program where [an MCO], under contract with [the Department], is paid on a monthly, fixed-fee basis per enrollee, and the MCO pays the provider pursuant to the terms of an agreement between the MCO and the provider.  Pennsylvania's Medicaid managed-care program is HealthChoices.

> \* \* \*

> Section 443.5 of the Human Services Code, Act of June 13, 1967, P.L. 31, added by the Act of July 15, 1976, P.L. 993, 62 P.S. §443.5, relating to prepayment for contracted medical services, authorizes [the Department] to enter into contracts with insurers, such as MCOs, through a competitive bidding process.  Section 443.5 of the Human Services Code provides, in relevant part:

Aetna's request for declaratory, injunctive, and mandamus relief filed in our original jurisdiction and the preliminary objections of the Department, Pennsylvania Health & Wellness, Inc. (PHW), Geisinger Health Plan (Geisinger), and Health Partners Plans (HPP) filed in response thereto. We reverse the Department's order, and dismiss as moot Aetna's petition filed in our original jurisdiction and the preliminary objections.

Under the HealthChoices Program, the Department contracts with MCOs to administer health services to those eligible for Medicaid in five "Zones," Northeast, Southeast, Lehigh-Capital, Southwest, and Northwest. Currently, Aetna has contracted with the Department to provide health benefits and administrative services to more than 200,000 enrollees in all five of these Zones.

On September 16, 2015, the Department issued Request for Proposal No. 06-16 (Original RFP) seeking MCOs to administer HealthChoices in all five Zones beginning in 2017. The Original RFP stated that the Department would award three-year contracts to up to five MCOs in each Zone and identified the following criteria: (1) technical criteria comprising 80% of the total points; (2) Small Diverse Business Participation with a weight of 20% of the total points; and (3) Domestic Workforce Utilization consisting of "bonus points" to a maximum of 3% of the total

> For categorically needy or medically needy persons eligible for medical assistance, prepaid capitation payments or insurance premiums for services under the medical assistance State plan may be made on behalf of eligible persons *through competitive bidding* with profit or non-profit contractors, insurers, or health maintenance organizations. Profit and non-profit insurers must be approved under applicable State laws. (Emphasis added.)

*Aetna Better Health of Pennsylvania Inc. v. Department of Human Services*, (Pa. Cmwlth., No. 351 M.D. 2016, filed July 6, 2016), slip op. at 1-3 n.1, 2 (citations omitted).

points. To qualify as a responsible offeror, the Original RFP stated that an MCO's technical submission must receive a total score of at least 70% of the available points allotted in the evaluation.

Aetna submitted a proposal to the Department to provide services in all of the five Zones. On April 27, 2016, the Department notified Aetna that it had only accepted Aetna's proposal for the Northwest Zone and rejected the proposals for the other four Zones. The Department announced that in addition to selecting Aetna for the Northwest Zone, the Department selected three other MCOs for that Zone, four other MCOs for the Northeast Zone, and five MCOs for each of the Southeast, Lehigh-Capital, and Southwest Zones. On May 4, 2016, Aetna filed a bid protest and asked for a debriefing conference and a stay of the procurement.

At the debriefing conference on May 9, 2016, the Department told Aetna that Aetna's total point score ranked in the top five in the Southeast, Lehigh Capital, and Southwest Zones, and in the top four in the Northeast Zone. Nevertheless, the Department stated that it "bumped" Aetna in favor of lower ranked offerors in those Zones due to a "Heritage Factor" involving offerors who had at least 25% of the market share in the relevant Zone, regardless of how they scored under the Original RFP. The Department indicated that it used the Heritage Factor to avoid disruption of services to HealthChoices enrollees, but the Department did not disclose in the Original RFP that it would be applying the Heritage Factor in choosing MCOs for HealthChoices. In response to Aetna's bid protest, on May 25, 2016, the Department informed Aetna that the bid protest procedures under the Commonwealth Procurement Code (Procurement Code)[4] do not apply to the

_____

[4] 62 Pa. C.S. §§101-2311. Specifically, Section 1711.1 of the Procurement Code provides, in relevant part:

4

Original RFP because it was not a procurement within the purview of that statute and that it would not issue a stay.[5]

As a result, Aetna filed a petition for review: (1) in this Court's original jurisdiction seeking declaratory judgment and a writ of mandamus; or, alternatively (2) in our appellate jurisdiction from the Department's determination that the Procurement Code did not apply and Aetna could not challenge the Department's final determination through a protest proceeding. In the petition, Aetna asserted that the Department's application of the Heritage Factor was a "secret criterion" that favored certain offerors and that its refusal to consider the protest and stay under the

> **(a) Right to protest.**—A bidder or offeror, a prospective bidder or offeror or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract, except as provided in section 521 (relating to cancellation of invitations for bids or requests for proposals), may protest to the head of the purchasing agency in writing.
>
> * * *
>
> **(l) Applicability.**—This section shall be the exclusive procedure for protesting a solicitation or award of a contract by a bidder or offeror, a prospective bidder or offeror, or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract. The provisions of 2 Pa. C.S. (relating to administrative law and procedure) shall not apply to this section.

62 Pa. C.S. §1711.1(a), (l).

[5] *See* Section 1711.1(k) of the Procurement Code, 62 Pa. C.S. §1711.1(k) ("In the event a protest is filed timely under this section and until the time has elapsed for the protestant to file an appeal with Commonwealth Court, the purchasing agency shall not proceed further with the solicitation or with the award of the contract unless and until the head of the purchasing agency, after consultation with the head of the using agency, makes a written determination that the protest is clearly without merit or that award of the contract without delay is necessary to protect substantial interests of the Commonwealth.").

5

Procurement Code was contrary to law and to its prior practices. Aetna argued that the Department's clear violation of law required declaratory and injunctive relief and an immediate stay of the Department's decision with respect to the Original RFP and that it would suffer irreparable harm in the absence of such relief. As a result, Aetna also filed an application for a preliminary injunction.

In its answer to the application, the Department again asserted that the Procurement Code did not apply to the Original RFP pursuant to Section 102(e) and (f), 62 Pa. C.S. §102(e), (f), which exclude "[MA] provider agreements" and grants from its provisions. However, in considering whether Aetna was entitled to injunctive relief, we determined that our opinion in *Stanton-Negley Drug Company v. Department of Public Welfare*, 927 A.2d 671 (Pa. Cmwlth. 2007) controlled and estopped the Department from relying on this argument.[6] *See Aetna Better Health*

---

[6] In that case, the Stanton-Negley Drug Company (Stanton) participated in the MA program, and filed a petition in this Court's original jurisdiction challenging a Department RFP seeking preferred providers for prescription medications known as "specialty drugs" to MA recipients. Stanton argued that the RFP precluded it from participating in the procurement and would harm its ability to continue providing specialty drugs to its MA recipients and asked this Court to declare the procurement and/or the RFP unlawful and enjoin the implementation of the program. The Department filed preliminary objections to the petition, arguing that this Court lacked original jurisdiction because Stanton's exclusive remedy was filing a bid protest pursuant to Section 1711.1 of the Procurement Code. We agreed with the Department that this Court lacked original jurisdiction based on the protest provisions of the Procurement Code, explaining:

> Section 1711.1 of the Procurement Code provides a general right of protest to "[a]n actual or prospective bidder, offeror or contractor who is aggrieved in connection with the solicitation or award of a contract." The aggrieved party may protest to the head of the purchasing agency in writing. Section 1711.1(b) of the Procurement Code. Section 1711.1(*l*) provides that Section 1711.1 "shall be the exclusive procedure for protesting a solicitation or award of a contract by a bidder or offeror[,] a prospective bidder or offeror, or a prospective contractor that is aggrieved in connection with the solicitation or award of a contract." Thus, as this Court has

*of Pennsylvania Inc.*, slip op. at 27 ("In short, this Court is bound by *Stanton-Negley*, and [the Department] is judicially estopped from challenging that decision. It is undisputed that [the Department] is refusing to accept Aetna's bid protest under the Procurement Code. 'Failure to comply with a statute is sufficiently injurious to constitute irreparable harm.'") (citation omitted).

Following a hearing, and review of the elements necessary to grant the requested injunctive relief,[7] this Court granted Aetna's request. We noted that "[a]t this early stage in the proceedings, [we have] real concerns about the credibility of the procurement process used for [the Original RFP]" because "despite Aetna's objection to [the Department]'s unprecedented use of a secret evaluation criterion through Aetna's bid protest and the dual jurisdiction action pending before the Court in this matter, [the Department] plans to move forward with the procurement." *Aetna Better Health of Pennsylvania Inc.*, slip op. at 31.

Accordingly, on July 19, 2016, this Court issued the following order:

---

> previously held, the Procurement Code sets forth the mandatory and exclusive remedy for disappointed bidders, offerors, prospective bidders or offerors, and prospective contractors, to challenge the solicitation or award of a contract.

*Stanton-Negley Drug Company*, 927 A.2d at 673 (footnote omitted).

[7] In order to obtain a preliminary injunction, Aetna was required to demonstrate: (1) an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) greater injury would result from refusing an injunction than from granting it; (3) a preliminary injunction will properly restore the parties to their status immediately prior to the alleged wrongful conduct; (4) the activity to be restrained is actionable, its right to relief is clear, and the wrong is manifest; (5) the injunction is reasonably suited to abate the offending activity; and (6) a preliminary injunction will not adversely affect the public interest. *Aetna Better Health of Pennsylvania Inc.*, slip op. at 19-20 (quoting *Summit Towne Center, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1001 (Pa. 2003)).

> [Aetna]'s emergency application for special relief in the nature of a special injunction and preliminary injunction [(Application)] is GRANTED in part and DENIED in part. Aetna's [Application] is GRANTED to the extent that it seeks to enjoin the execution and implementation of any agreement resulting from [the Original RFP], pending further order from the Court. Should [the Department] elect to hear Aetna's bid protest in the meantime, [the Department] should use a hearing officer who is not employed by [the Department] and who does not have any connection to or knowledge of the solicitation, consideration, or award under [the Original RFP]. In all other respects, the application will be DENIED.

*Aetna Better Health of Pennsylvania Inc.*, slip op. at 33.

In lieu of complying with the foregoing order of this Court, two days later, on July 21, 2016, the Department issued the Reissued RFP again seeking MCOs to provide HealthChoices services to MA beneficiaries in the five Zones.[8] The Reissued RFP provides for agreements with a three-year term with an option for one additional renewal two-year term. The Department's Bureau of Financial Operations, Division of Procurement and Contract Management (Bureau) is the Issuing Office of the Reissued RFP, and "[t]he sole point of contact in the Commonwealth for th[e Reissued] RFP" is Erin Slabonik, the Project Officer for the Reissued RFP. Reproduced Record (R.R.) at 50a.

---

[8] *See* Section 521 of the Procurement Code, 62 Pa. C.S. §521 ("[A] request for proposals or other solicitation may be canceled . . . at any time prior to the time a contract is executed by all parties when it is in the best interests of the Commonwealth. . . . The reasons for the cancellation or rejection shall be made part of the contract file."). *See also Scientific Games International, Inc. v. Department of Revenue*, 66 A.3d 740, 758 (Pa. 2013) ("The Legislature has deliberately excluded Section 521 cancellations from the scope of the right of protest. *See* 62 Pa. C.S. §1711.1(a) (prescribing that bidders, offerors, and certain others "aggrieved in connection with the solicitation or award of a contract, *except as provided in section 521 (relating to cancellation of invitations for bids or requests for proposals)*, may protest to the head of the purchasing agency in writing" (emphasis added)).").

Initially, the Reissued RFP retained consideration of the Heritage Factor under the RFP and did not provide for a bid protest mechanism; however, following a protest by Aetna, the Department issued Addendum 1 to the Reissued RFP which removed the Heritage Factor from consideration and states that "[i]n the event an Offeror elects to file a bid protest, the Department will accept the bid protest. The Department will address the merits of the bid protest if the bid protest is timely filed." R.R. at 93a.

The Reissued RFP states that the following criteria was to be used to evaluate the proposals: (1) technical criterion based on a Work Statement Questionnaire/Soundness of Approach, Personnel Qualifications and Staffing, and Prior Experience and Performance (80% or 8,000 of the possible 10,000 total points);[9] (2) Small Diverse Business and Small Business (SDB/SB) Participation as determined by the Department of General Services' (DGS) Bureau of Diversity, Inclusion and Small Business Opportunities (BDISBO) (20% or 2,000 of the possible 10,000 total points); and (3) Domestic Workforce Utilization bonus points (up to 3% of the possible 10,000 total points). R.R. at 84a-86a. In order to be considered a responsible offeror, "and therefore eligible for selection for agreement negotiations," the total score for the technical submission in a proposal for each Zone "must be greater than or equal to 75% of the available technical points." *Id.* at 86a.

_____

[9] Of the 8,000 points, the Department assigned 800 points for the Personnel component; 200 points for the Prior Experience component; and 7,000 points for the Soundness of Approach component. R.R. at 295a-296a. In turn, the 7,000 total points of the Soundness of Approach component were allocated as follows: (1) Planned Approach – 150 points; (2) Member Management – 550 points; (3) Utilization Management – 150 points; (4) Care Management – 600 points; (5) Special Needs – 300 points; (6) Coordination of Care – 400 points; (7) Quality and Performance Management – 2,325 points; (8) Provider Network Composition and Network Management – 725 points; (9) Value Based Purchasing – 1,200 points; (10) Pharmacy/Outpatient Drugs – 250 points; and (11) Management Information Systems – 350 points. *Id.* at 296a.

9

The Reissued RFP specifically provides that "[t]he Department, in its sole discretion, may undertake negotiations with Offerors whose proposals, in the judgment of the Department, show them to be qualified, responsible, and capable of providing the services." R.R. at 53a.[10] However, with respect to "Discussions for Clarification," the Reissued RFP states that "Offerors may be required to make an oral or written clarification of their proposals to the Department to ensure thorough mutual understanding and Offeror responsiveness to the solicitation requirements. The Project Officer will initiate requests for clarification." *Id.* at 59a-60a. Additionally, the Reissued RFP provides that "[f]rom the issue date of this RFP until the Department selects proposals for award, the Project Officer is the sole point of contact concerning this RFP. Any violation of this condition may be cause for the Department to reject the offending Offeror's proposal." *Id.* at 61a. Finally, the Department would "notify the selected Offerors in writing of their selection for negotiations after determining those proposals that are most advantageous and in the best interest of MA beneficiaries and the Commonwealth." *Id.* at 63a.

The Department received proposals from eleven different MCOs: nine for the Southeast Zone; ten for the Lehigh/Capital Zone; seven for the Southwest Zone; six for the Northwest Zone; and seven for the Northeast Zone. Aetna

_____

[10] Section 513(f) of the Procurement Code states:

> As provided in the [RFP], discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining best and final offers [(BAFOs)]. Responsible offers shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals. In conducting the discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors.

62 Pa. C.S. §513(f).

10

submitted a proposal in response to the Reissued RFP to provide services in all five Zones. Likewise, PHW sought to provide services in all five Zones. On November 18, 2016, the Project Officer notified Aetna that its "proposals were not among those proposals determined to be the most advantageous to the Commonwealth" and Aetna filed a bid protest based on the Department's November Selection Memorandum.

However, the November Selection Memorandum revealed that BDISBO scored the SDB/SB portion of the proposals on a 200-point scale and not a 2,000-point scale as provided in the Reissued RFP. On December 12, 2016, the Department notified BDISBO of the scoring error and asked BDISBO to correct the mistake. On December 15, 2016, the Department's Secretary and DGS's Secretary called Aetna and stated that they would rescind the November Selection Memorandum due to the error in scoring and the Department sent Aetna a letter the following day confirming the rescission. As a result, the Department did not issue a written determination of Aetna's bid protest stemming from the November Selection Memorandum.

On December 19, 2016, Leesa Allen, the Department's Deputy Secretary for the Office of Medical Assistance Programs (OMAP), and Sallie Rodgers, Deputy Chief Counsel in the Department's Office of General Counsel, met with Michael Neidorff, Chairman and CEO of Centene Corporation (Centene), PHW's parent corporation, and Brent Layton, an Executive Vice President and the Chief Business Development Officer of Centene. R.R. at 1000a-1006a. Deputy Secretary Allen requested the meeting with PHW to discuss PHW's operational readiness to operate as an MCO on a statewide basis. *Id.* at 1001a-1002a. Allen was concerned about PHW's readiness because of: the abbreviated time frame for the implementation of the HealthChoices Program agreements; the significant amount

11

of resources that were necessary for a successful Readiness Review; the planned implementation of Community HealthChoices Program (CHC), a new managed care initiative separate from the HealthChoices Program that will begin implementation in 2018 and for which PHW is a selected offeror in all five Zones; and PHW was a new plan coming into the HealthChoices Program. *Id.* at 1002a.

From Layton's perspective, the December 19th meeting with the Department's Deputy Secretary and Deputy Chief Counsel was generally about PHW's readiness to perform in various Zones, the status of PHW's Certificate of Authority to conduct business in Pennsylvania, and its approval to operate in specific counties. R.R. at 1005a. Potential contracting issues in various Zones were discussed, but PHW did not modify or withdraw its proposal in any Zone. *Id.* Layton indicated that if PHW was selected by the Department to proceed to negotiations, as a new entrant into an existing market, one of the issues that it would want to understand and discuss is the Department's auto-assignment algorithm, but no specific changes to the auto-assignment algorithm were agreed to by the parties. *Id.*

On December 22, 2016, the Department issued a new December Selection Memorandum, which corrected the SDB/SB scoring and made the recommended selections of MCOs for agreement negotiations for the HealthChoices Program in all five Zones. R.R. at 96a-105a. The Department selected five MCOs in the Southeast Zone; four MCOs each in the Southwest Zone and the Lehigh/Capital Zone; and three MCOs each in the Northeast Zone and the Northwest Zone. *Id.* at 97a. Based on the Department's scoring, Aetna was not selected for negotiations in any Zone based on its rankings as eighth in the Southeast Zone; sixth

12

in the Southwest Zone; seventh in the Lehigh Capital Zone; seventh in the Northeast Zone; and sixth in the Northwest Zone. *Id.* at 100a-102a.

In contrast, although the Department's scoring of PHW's proposals were high enough for selection in all five Zones, the Department determined that PHW would participate in the Southeast, Lehigh/Capital, and Southwest Zones. R.R. at 103a. This determination was based on "discussions between [PHW] and the Department, [in which] the Department agreed that [PHW] will participate in the Southeast, Southwest, and Lehigh/Capital zones." *Id.*

On December 29, 2016, Aetna filed a bid protest challenging the December Selection Memorandum. R.R. at 10a-15a Aetna outlined the procedural history of the issuance and withdrawal of the Original RFP; this Court's opinion and order granting Aetna relief in that matter; the Department's withdrawal of the Original RFP and issuance of the Reissued RFP; the Department's issuance of the November Selection Memorandum; Aetna's timely protest of that Memorandum; the Department's rescission of that Memorandum; and the Department's issuance of the December Selection Memorandum in which Aetna was not selected for negotiation in any of the Zones. *Id.*

Aetna asserted that its proposal for all of the Zones "fully and completely met the requirements of [the Reissued RFP] and demonstrated that Aetna is fully qualified, responsible and capable of providing physical health services in every one of the five Zones that encompass the HealthChoices program in the Commonwealth." R.R. at 10a. Aetna claimed that "[t]he Department's latest decision to not award Aetna a contract for [the Reissued RFP] is part of an ongoing arbitrary and non-transparent procurement process that began after the Department issued [the Original RFP]," and that "[t]he Department has yet to provide details

13

concerning the scoring results for [the Reissued RFP], the evaluation of bids for that process, or the reasons why Aetna was not selected." *Id.* at 10a, 14a. Ultimately, Aetna asked that, "[i]n light of the Department's recent actions in denying Aetna a bid protest remedy for [the Original RFP] and its handling of Aetna's initial protest for [the Reissued RFP]," the Department stay "the negotiation and award of contracts" under the Reissued RFP. *Id.* at 14a. Geisinger, Gateway Health Plan, Inc. (Gateway), PHW, and OMAP filed responses to Aetna's bid protest outlining various reasons why the protest should be denied. *Id.* at 28a-40a.

On January 20, 2017, the Department held a debriefing conference regarding Aetna's bid protest. R.R. at 295a-303a. On January 27, 2017, Aetna filed a Supplemental Protest in which it alleged that it had first learned of the Department's December 19th meeting with PHW at that January 20th debriefing conference, and argued that the December 19th meeting violated the stay provision of Section 1711.1(k) of the Procurement Code and the "fair and equal treatment" provision of Section 513(f). *Id.* at 170a, 174a-175a, 176a-177a.[11] Aetna also alleged that at the debriefing conference it first learned of the technical scoring criteria and the formula used to compute the scores, which was not disclosed in the Reissued RFP and which benefitted the same MCOs that the Department improperly favored by applying the Heritage Factor in the Original RFP. *Id.* at 170a, 171a-174a. Aetna

---

[11] In this regard, Aetna also alleged that the project manager of the Original RFP was "one of the architects" of the prohibited Heritage Factor in that RFP and was involved in the creation of the Reissued RFP and the evaluation and scoring of the proposals submitted in response to the Reissued RFP. R.R. at 175a-176a.

14

also argued that the Department violated Section 513(g) of the Procurement Code,[12] requiring the selection of "responsible offerors," by failing to evaluate the SDBs included in the proposals and by accepting PHW's SDB commitment and calculation because they were unrealistic. *Id.* at 178a-179a. Aetna also requested discovery to obtain additional information from the Department and an evidentiary hearing on its bid protest pursuant to Section 1711.1(e)[13] in order to protect its procedural due process rights. *Id.* at 180a.

Finally, Aetna asked the Department to grant the following relief: (1) stay the procurement process related to the Reissued RFP until its bid protest is resolved; (2) appoint a hearing officer that is not employed by the Department and who does not have any connection with or knowledge of the Original RFP or the Reissued RFP; (3) direct the Department to produce all documents and information needed by Aetna to prepare for and conduct a proper hearing; (4) conduct a hearing to obtain all facts and consider all evidence necessary to fairly evaluate Aetna's protest; and (5) direct that Aetna be selected for contract negotiations in all five Zones or, in the alternative, direct that Aetna's current HealthChoices contracts remain in effect. R.R. at 180a. OMAP, PHW, Geisinger, and Gateway filed responses to Aetna's Supplemental Protest. *Id.* at 256a-260a, 261a-263a, 264a-270a, 271a-293a.

---

[12] 62 Pa. C.S. §513(g). Section 513(g) states that "[t]he responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency, taking into consideration price and all evaluation factors, shall be selected for contract negotiations."

[13] 62 Pa. C.S. §1711.1(e). Section 1711.1(e) states, in relevant part, that "[t]he head of the purchasing agency or his designee shall review the protest and any response or reply and may request and review such additional documents or information he deems necessary to render a decision and may, at his sole discretion, conduct a hearing."

15

On February 24, 2017, Aetna filed a reply to OMAP's response that included another Supplemental Protest and incorporated its prior protests. R.R. at 450a-477a. In the Supplemental Protest, Aetna raised a new protest ground, arguing that the Department violated Sections 513(f) and 1711.1(k) by negotiating with PHW regarding the auto-assignment algorithm that the Department would use as evidenced by public statements made by PHW on January 10, 2017, and February 7, 2017, and requested the same relief as in the prior Supplemental Protest. *Id.* OMAP, PHW, Geisinger, and Gateway filed responses to this Supplemental Protest as well, *id.* at 904a-906a, 908a-911a, 954a-959a, 978a-979a, and Aetna replied to the responses.

On February 27, 2017, the Department's Director of the Bureau of Administrative Services (Department's Director), acting as the Department Secretary's designee to review and dispose of Aetna's bid protests, asked OMAP to provide redacted SDB/SB Letters of Intent submitted by PHW for the Southeast, Southwest, and Lehigh/Capital Zones. On March 9, 2017, OMAP submitted the requested information. R.R. at 912a-951a. Aetna did not file a response although invited to do so by the Department's Director. *Id.* at 952a-953a.

On April 17, 2017, the Department's Director requested affidavits from the Department's Deputy Secretary for OMAP and Centene's Executive Vice President and the Chief Business Development Officer regarding the December 19th meeting to address: (1) the individuals present at the meeting; (2) the meeting's purpose; (3) the issues or subject matter discussed; and (4) the agreements or conclusions reached during or as a result of the meeting. R.R. at 993a-994a. The affidavits were submitted on April 24, 2017. *Id.* at 1000a-1006a.

On April 25, 2017, Aetna filed another Supplemental Protest, incorporating its prior protest and a protest filed by UnitedHealthcare of Pennsylvania, Inc. (United), which alleged that United obtained information demonstrating that PHW may have subcontracted with SDB companies that are not proper SDBs under the Reissued RFP. R.R. at 1015a-1017a. Aetna requested the same relief as that in the prior Supplemental Protests. *Id.* at 1017a.

On May 5, 2017, Aetna submitted a response to the affidavits, noting that the parties that were present at the meeting that have made public statements about the meeting did not submit affidavits. R.R. at 1144a. Aetna also outlined material inconsistencies between the affidavits indicating that some information regarding the scoring results was discussed, and regarding the reasons why PHW was not selected in the Northeast and Northwest Zones. *Id.* at 1144a-1145a. As a result, Aetna argued that the Department must hold a hearing to address the issues raised in Aetna's protests and the affidavits, and must produce all of the documents that Aetna has requested including those relating to the December 19th meeting between the Department and PHW. *Id.* at 1145a-1147a. Aetna claimed that the affidavit of the Department's Deputy Secretary for OMAP confirms that the meeting and the side-deal between the Department and PHW violated the Procurement Code and the Procurement Handbook.[14] *Id.* at 1147a-1148a.

---

[14] Section 301(a) of the Procurement Code states that the "[f]ormulation of procurement policy governing the procurement . . . of . . . services . . . for executive . . . agencies shall be the responsibility of [DGS] as provided for in Subchapter B (relating to procurement policy)." 62 Pa. C.S. §301(a). In turn, Section 311 of the Procurement Code states that DGS "may promulgate regulations governing the procurement . . . of any and all . . . services . . . to be procured by Commonwealth agencies," and that DGS "shall consider and decide matter of policy within the provisions of this part." 62 Pa. C.S. §311. To this end, DGS promulgated the Procurement Handbook to "provide[] a standard reference to established policy, procedures, and guidelines for the procurement of . . . services . . . under the authority of the Commonwealth Procurement Code,"

17

Ultimately, on June 5, 2017, the Department's Director issued a Final Agency Determination disposing of all of Aetna's bid protests. Final Agency Determination at 1-24. With respect to Aetna's claims regarding the December 19th meeting, the Director initially noted that "[i]n order to protest the solicitation or award of a contract or agreement, a bidder or offeror must be 'aggrieved' in connection with the solicitation or award. 62 Pa. C.S. §1711.1(a) . . . ." *Id.* at 16 (citations omitted). The Director determined that "Aetna has failed to show or suggest that it has been 'aggrieved' by any contact or discussion between OMAP and PHW," that "[t]he non-selection of PHW in two of the five zones conferred a

and that "the policies, procedures, and guidelines of this handbook apply to the procurement of all . . . services . . . in which an executive . . . agency is a participant." Procurement Handbook Part I, Chapter 1(A), (B). However, DGS explains that "[t]his handbook constitutes guidelines to . . . the executive . . . agencies concerning the procurement of . . . services," but it "is not and does not purport to operate as a regulation and does not establish a binding norm nor have or purport to have the force of law." *Id.* at Part I, Chapter 1(D). As a result, "[a] procurement or resulting contract shall not be invalidated for failing to strictly adhere to the provisions of this handbook provided the procurement or contract otherwise complies with the [] Procurement Code." *Id. See also id.* at Part I, Chapter 1(C)(2) ("The policies, procedures, and guidelines of this handbook will not apply to . . . [MA] provider agreements administered by [the Department] . . . .").

Nevertheless, this Court has relied on the Procurement Handbook where the Procurement Code does not specifically conflict with the relevant Procurement Handbook provision. *See, e.g., Global Tel\*Link Corporation v. Department of Corrections*, 109 A.3d 809, 818-19 (Pa. Cmwlth.), *appeal denied*, 121 A.3d 497 (Pa. 2015) ("GTL argues that Securus's participation in its protest and hearing was unlawful because the only proper parties to a protest are the protestant and the contracting officer under Section 1711.1 of the Procurement Code, and the selected bidder may not participate because it is not an enumerated party to a protest under the statute. However, the Secretary noted that while the Procurement Code does not specifically provide for the participation of other parties in a protest, Chapter 58(D) of the Procurement Handbook provides for the participation of 'all bidders and offerors who appear to have a substantial and reasonable prospect of winning the award . . . .' In sum, the Secretary did not err in permitting Securus to participate in the instant protest or hearing because its participation is not prohibited by the Procurement Code and is specifically provided for in the Procurement Handbook.") (citations omitted). The Procurement Handbook may be found on DGS's website at http://www.dgs.pa.gov/State%20Government/Materials-and-Services-Procurement/Procurement-Handbook/Pages/default.aspx#part1 (last visited March 2, 2018).

benefit or advantage to Aetna by rendering an additional 'slot' available for selection," and that "[t]he only offeror that may potentially have been aggrieved by the non-selection of PHW in the Northeast and Northwest zones was PHW itself." *Id.* As a result, the Director concluded that "Aetna was not aggrieved by not having a similar meeting with OMAP." *Id.*

Alternatively, the Director determined that the December 19th meeting did not violate the automatic stay provision of Section 1711.1(k) of the Procurement Code based on Aetna's bid protest of the November Selection Memorandum. Final Agency Determination at 17. The Director explained that "[u]pon the rescission of the original sections [in that Memorandum], the protest of those selections necessarily became moot thereby eliminating any need for a written determination of those protests" and that "Aetna has not explained why a determination of a moot protest is required, particularly where, as here, the selections that were protested were found to be erroneous and corrected." *Id.* Accordingly, the Director concluded, "the Department did not violate the automatic stay by engaging in discussions or negotiations with PHW because no such stay was in place." *Id.* The Director found that "[e]ven assuming a stay was in place, any violation thereof was a mere technical violation and does not warrant cancelling the selections made under the Reissued RFP." *Id.* at 18.

The Director also determined that the December 19th meeting did not violate the provisions of Section 513(f) of the Procurement Code, requiring that all offerors "be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals," because "[f]air and equal treatment does not mean identical treatment." Final Agency Determination at 18 (citation omitted). The Director noted that while "a term of the agreement was discussed [at the

December 19ᵗʰ meeting], namely the auto-enrollment algorithm," the meeting did not violate Section 513(f) "given that no changes or agreements were made as a result of that discussion." *Id.*

Finally, in this regard, the Director found that the Department's selection in three of the five Zones did not violate Section 513(g) of the Procurement Code requiring the Department to select a "responsible offeror" for contract negotiations. Final Agency Determination at 18-19. The Director noted that in the affidavits, both OMAP and PHW assert that the primary purpose of the December 19ᵗʰ meeting was "to inquire into PHW's readiness to operate on a statewide basis and to ensure an adequate network of providers for implementation purposes." *Id.* at 18. The Director explained that "[t]here is a distinction between earning a score high enough in a zone to be a selected offeror under the Reissued RFP, and being able to ramp up a business operation as complex and demanding as being an MCO in both the [HealthChoices] and CHC[15] programs." *Id.* at 19. The Director found that "[t]here is nothing improper in seeking assurances from an MCO that stands to go from zero to five zones in not just the [HealthChoices] program, but the new [Community HealthChoices] program, as well," and that "[e]ven if the result of the December 19 meeting was that PHW was not selected in the Northeast zone or the Northwest zone, . . . such result is evidence that OMAP exercised its judgment when evaluating which proposals were most advantageous to the Commonwealth." *Id.*

Further, the Director determined that Aetna "has presented no evidence that the Department offered any *quid pro quo* in exchange for PHW's non-selection

---

[15] The CHC program is "a new managed care initiative separate from the HealthChoices [] Program, which will begin implementation in January 2018 and for which PHW is a selected offeror in all five CHC zones." Final Agency Determination at 8-9 n.6.

in two zones or that PHW altered its proposal to withdraw from those zones," and that "[t]he December Selection Memorandum, which still lists PHW in the Northeast and Northwest zones, demonstrates that PHW did not withdraw or modify its proposals in those zones." Final Agency Determination at 19 (citations and footnote omitted). Based on the foregoing, the Director concluded that "Aetna has failed to meet its burden of demonstrating that the Department's determination to proceed to negotiations with PHW in three zones was clearly erroneous, arbitrary, capricious, or contrary to law" and that Aetna's claims in this regard "are without merit." *Id.*[16] Accordingly, the Director denied Aetna's bid protests. *Id.* at 24.

---

[16] The Director also denied Aetna's requests for the production of documents or for an evidentiary hearing, and rejected as without merit Aetna's claims that: (1) OMAP's evaluation and scoring of the technical submittals was arbitrary, capricious, an abuse of discretion, or contrary to law; (2) the manner in which OMAP and DGS designed and scored the SDB/SB submittals was arbitrary, capricious, an abuse of discretion, or contrary to law; (3) the Department's ongoing discussion with PHW violates the automatic stay provisions of Section 1711.1(k) of the Procurement Code; and (4) OMAP acted in a manner that displayed favoritism to certain offerors. *See* Final Agency Determination at 11-16, 19-23.

In this appeal,[17, 18] Aetna claims that the Director erred in denying its bid protests because the December 19th meeting between the Department's Deputy Secretary for OMAP and Deputy Chief Counsel in the Department's Office of General Counsel, and Centene's Chairman and CEO and Executive Vice President and the Chief Business Development Officer is not authorized by the Reissued RFP thereby violating the Procurement Code and the Procurement Handbook. We agree.

As noted above, Section 513(f) of the Procurement Code states that "[a]s provided in the [RFP], discussions and negotiations may be conducted with responsible offerors for the purpose of clarification and of obtaining [BAFOs,[19]]"

[17] Section 1711.1(i) of the Procurement Code states that this Court "shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency," and "[s]hall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law." 62 Pa. C.S. §1711.1(i). *See also* Section 561 of the Procurement Code, 62 Pa. C.S. §561 ("The determinations required by the following sections are final and conclusive unless they are clearly erroneous, arbitrary, capricious or contrary to law: . . . Section 513(a) and (g) (relating to competitive sealed proposals)."). Purchasing agencies are bound by the express terms of their RFPs. *American Totalisator Co. v. Seligman*, 414 A.2d 1037, 1041 (Pa. 1980). An agency abuses its discretion when it fails to follow its own regulations and procedures. *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission*, 542 A.2d 606, 608 (Pa. Cmwlth. 1988).

[18] PHW, United, Geisinger, Gateway, and HPP have intervened in Aetna's appeal. Additionally, both United and Vista Health Plan, Inc., another MCO, filed bid protests that were ultimately denied by the Department. Their appeals of the Department's Final Agency Determinations are lodged in this Court at Nos. 790 C.D. 2017 and 820 C.D. 2017, respectively. By Stipulation and Order approved by this Court on June 30, 2017, the Department agreed to stay all procurement activities with regard to the Reissued RFP, including negotiations of any kind or readiness review activities, until this Court's disposition of Aetna's petition for review. The Department also agreed that the existing HealthChoices agreements will remain in effect and will not be terminated.

[19] The Procurement Code does not define "discussions," "negotiations," or "clarification." As a result, the rules of statutory construction apply. *City of Philadelphia v. City of Philadelphia Tax Review Board ex rel. Keystone Health Plan East, Inc.*, 132 A.3d 946, 952 (Pa. 2015). "'When statutory words or phrases are undefined by the statute, the Court construes the words according to their plain meaning and common usage.' A statute must be given its plain and obvious

22

and that "[r]esponsible offers shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals." 62 Pa. C.S. §513(f). *See also* Part I, Chapter 6(B)(10)(e)(1)(f) of the Procurement Handbook ("It is imperative that offerors selected to submit a [BAFO] be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals."). In turn, Section 513(g) provides that "[t]he responsible offeror whose proposal is determined in writing to be the most advantageous to the purchasing agency . . . shall be selected for contract negotiation." 62 Pa. C.S. §513(g).

In *Pepco Energy Services, Inc. v. Department of General Services*, 49 A.3d 488 (Pa. Cmwlth. 2012), the bidder submitted a proposal to DGS in response to an RFP seeking a Design Build Contractor to design, finance, construct, own, operate, and maintain a state-of-the-art Combined Heating, Cooling, and Power

---

meaning." *Harmer v. Pennsylvania Board of Probation and Parole*, 83 A.3d 293, 299 (Pa. Cmwlth.), *appeal denied*, 97 A.3d 746 (Pa. 2014) (citations omitted). "[I]t is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute." *Hoffman Mining Company, Inc. v. Zoning Hearing Board of Adams Township*, 32 A.3d 587, 592 (Pa. 2011) (citation omitted). "Where a court needs to define an undefined term, it may consult definitions in statutes, regulations or the dictionary for guidance, although such definitions are not controlling." *Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006), *appeal denied*, 923 A.2d 1175 (Pa. 2007).

"Discussion" is defined as "consideration of a question in open usu. informal debate" and "argument for the sake of arriving at truth or clearing up difficulties." *Webster's Third New International Dictionary* 648 (1976). "Negotiation" is defined as "a business transaction" and the "action or process of negotiating or of being negotiated." *Id.* at 1514. In turn, "negotiate" is defined as "to communicate or confer with another so as to arrive at the settlement of some matter;" to "meet with another so as to arrive through discussion at some kind of agreement or compromise about something." *Id. See also Black's Law Dictionary* 1150 (10th ed. 2009) (defining "negotiation" as "[a] consensual bargaining process in which parties attempt to reach agreement on a disputed or potentially disputed matter" and "[d]ealings conducted between two or more parties for the purpose of reaching an understanding."). Finally, "clarification" is defined as "the act or process of clarifying." *Id.* at 415. In turn, "clarify" is defined as "to explain clearly," to "make understandable," or "to make less complex or less ambiguous." *Id.*

23

Plant to provide electricity, steam, hot and chilled water to a proposed State Correctional Facility in Montgomery County. In the proposal, Pepco stated that it was based on the understanding that it will have the opportunity to negotiate the Energy Services Agreement, the Ground Lease, and the Surety Agreement prior to selection. Ultimately, DGS rejected the proposal as non-responsive because the RFP provided that these provisions were not negotiable and the proposal's conditional language constituted an impermissible alternative proposal. Pepco filed a bid protest that DGS denied and appealed to this Court. On appeal, Pepco argued that DGS erred in rejecting the proposal as non-responsive because its attempt to negotiate key terms and conditions was valid under Section 513(g) of the Procurement Code.

With respect to subsections (f) and (g) of Section 513 of the Procurement Code, this Court explained:

> Section 513(g) of the Code [] provides that an offeror "shall be selected for contract negotiation[.]" Section 513(g) of the Code first requires that the offeror be a "*responsible offeror.*" (Emphasis added). The Code specifically defines "responsible offeror" as "[a]n offeror that has submitted a *responsive proposal* and that *possesses the capability to fully perform the contract requirements in all respects* and the integrity and reliability to assure good faith performance." Section 103 of the Code, 62 Pa. C.S. §103 (emphasis added). The Code further defines "responsive proposal" as "[a] proposal which *conforms in all material respects to the requirements and criteria in the [RFP].*" *Id.* (emphasis added). By definition, therefore, if a proposal on its face does not meet the requirements and criteria of a[n RFP], then it is not considered a responsive proposal and the offeror cannot be considered a responsible offeror. Thus, read in concert with Section 103 of the Code, Section 513(g) of the Code establishes a framework whereby the issuing agency must first determine if the offeror is a responsible offeror, meaning that its proposal meets the requirements and criteria of the [RFP]. Then, the

24

responsible offeror with the most advantageous proposal is "selected for contract negotiation." This interpretation is further supported by the language of Section 513(g), which provides that the "responsible offeror whose proposal is determined . . . to be the most advantageous . . . , *taking into consideration . . . all evaluation factors*, shall be selected for contract negotiation." . . .

[Additionally,] a[n RFP] may provide for contract negotiations. In *Language Line Services, Inc. v. Department of General Services*, 991 A.2d 383 (Pa. Cmwlth.), *appeal denied*, [13 A.3d 481 (Pa. 2010)], we noted that Section 513 of the Code allows an issuing agency "the opportunity to enter into discussions and negotiations with responsible offerors *'[a]s provided in the [RFP]*.'" *Language Line Services*, 991 A.2d at 390 (emphasis added). It also provides that "[r]esponsible offerors shall be accorded fair and equal treatment." Section 513(f) of the Code. In *Language Line Services*, when considering whether the issuing agency had violated the Code and fundamental principles governing public contracting when it requested [BAFOs] from only certain bidders, this Court looked to the Code and the language of the [RFP] at issue. The language in the [RFP] in that case "specifically stated and put offerors on notice that [the issuing agency] was reserving the right to limit BAFO discussions to responsible offerors whose proposals were considered 'reasonably susceptible of being selected for award.'" *Id. . . .*

Based upon the language of Section 513(g) of the Code and our decision in *Stanton–Negley*, it is apparent that Section 513, in itself, does not entitle an offeror to engage in contract negotiations before the issuing agency makes a determination regarding whether the offeror is a responsible offeror (*i.e.*, whether the offeror submitted a responsive or non-responsive proposal) or before the issuing agency makes a determination as to which proposal is most advantageous. An agency, however, through its [RFP], may provide offerors with an opportunity to negotiate or provide revised proposals throughout the [RFP] process. *See Stanton–Negley*.

25

*Pepco*, 49 A.3d at 493-94.

Thus, we rejected Pepco's "contention that under Section 513(g), following the submission of a proposal, every term of a contract becomes negotiable, including provisions that the issuing agency already identified as non-negotiable in its [RFP]." *Pepco*, 49 A.3d at 493. We also concluded "that, pursuant to the provisions of the RFP, [Pepco] had no right to negotiate the terms of the Design Build Contract and the documents appended to it." *Id.* at 494.

With respect to the December 19th meeting in this case, the Department's Director found as fact that the "Deputy Secretary [] had requested the December 19 meeting with PHW to discuss PHW's readiness to operate as an MCO on a statewide basis," and that she "was concerned with PHW's operational readiness because of 'the abbreviated time frame for the implementation of the new [] HealthChoices agreements, the significant amount of resources necessary for a successful Readiness Review, the planned implementation of CHC, and PHW coming into the HealthChoices Program as a new plan.'" Final Agency Determination at 18. The Director also found that "potential contracting issues were discussed, that PHW did not modify or withdraw its proposal in any zone, and that if selected to proceed to negotiations, PHW would 'want to understand and discuss' the Department's auto-assignment algorithm, but no specific changes to the auto-assignment algorithm were agreed to.'" *Id.* at 19.

Whether the December 19th meeting between the Department's Deputy Secretary and Deputy Chief Counsel was a "discussion" or "negotiation" with PHW "for the purpose of clarification and of obtaining a [BAFO]," or merely to assist in determining whether PHW was a "responsible" bidder, within the purview of Section 513 of the Procurement Code, it is clear that the meeting violated the

26

provisions of the Procurement Code, the RFP and the Procurement Handbook. It is true that Section I-5 of the Reissued RFP states that "[t]he Department, in its sole discretion, may undertake negotiations with Offerors whose proposals, in the judgment of the Department, show them to be qualified, responsible, and capable of providing the services." R.R. at 53a. *See also* Section I-26, *id.* at 63a ("The Department will notify the selected Offerors in writing of their selection for negotiations after determining those proposals that are most advantageous and in the best interests of MA beneficiaries and the Commonwealth."); Section III-3, *id.* at 84a ("The Department will notify in writing of its selection for negotiations the responsible Offerors whose proposals are determined to be the most advantageous and in the best interests of MA beneficiaries and the Commonwealth as determined by the Department after taking into consideration all evaluation and selection factors.").

However, Section I-2 of the Reissued RFP states that, prior to such a determination and written notification, the Department's Bureau is the Issuing Office "[t]he sole point of contact in the Commonwealth for this RFP shall be . . . the Project Officer for this RFP." R.R. at 50a. *See also* Section I-21, *id.* at 61a ("From the issue date of this RFP until the Department[] selects proposals for award[,] the Project Officer is the sole point of contact concerning this RFP."). Likewise, Part I, Chapter 6(B)(2)(q) of the Procurement Handbook provides that "[t]he Issuing Office . . . [c]onducts pre-selection negotiations, if desired, consistent with the terms of the RFP." Finally, Part I, Chapter 6(B)(10)(e)(2)(c) of the Procurement Handbook states that "[t]he issuing office, or the evaluation committee chairperson or designee, will conduct the pre-selection negotiations."

27

With respect to the clarification of PHW's proposal, Section I-17 of the Reissued RFP specifically provides that "Offerors may be required to make an oral or written clarification of their proposals to the Department to ensure thorough mutual understanding and Offeror responsiveness to the solicitation requirements. *The Project Officer will initiate requests for clarification*." R.R. at 60a (emphasis added). *See also* Section I-9, *id.* at 55a ("If an Offeror has any questions regarding this RFP, the Offeror must submit the questions by email . . . to the Project Officer named in Part I, Section I-2 of the RFP.").

Likewise, Part I, Chapter 6(B)(2)(m) of the Procurement Handbook states that "[t]he Issuing Office: . . . [r]equests clarification of proposals from offerors as determined necessary to ensure responsiveness to the solicitation and thorough understanding of the proposals." Additionally, Part I, Chapter 6(B)(3)(b)(2) of the Procurement Handbook states that "[i]f clarification of a proposal is needed, [the Evaluation Committee] communicates the need for clarification to the issuing office and assists the issuing office in communicating with those offerors whose proposals need clarification." *See also* Part I, Chapter 6(B)(10)(c)(1) and (2) ("The evaluation committee may ask the issuing office to seek clarification from an offeror to assure full understanding of and responsiveness to the RFP. . . . The issuing officer, on behalf of the evaluation committee, shall make all contacts with the offeror in writing.").

Finally, with respect to an inquiry into, or a determination of, whether PHW can adequately perform under the contract or is a "responsible offeror" under the Reissued RFP, Section I-23 states:

> **I-23.  *Issuing Office Participation.***
>
> * * *

28

> Prior to the enrollment of MA consumers in an MCO, the Department will conduct a readiness review. MA Consumers will not be able to enroll in a selected MCO and the Department will not enter into an agreement with the selected [MCO] until the Department determines that the MCO has satisfied the readiness review requirements. . . . At its discretion, the Department may commence monitoring before the effective or operational dates of the agreement, and before the formal Readiness Review period.

R.R. at 61a (emphasis added). *See also* Section III-5, *id.* at 86a, 87a ("To be responsible, an offeror must submit a responsive proposal and possess the capability to fully perform the agreement requirements in all respects and the integrity and reliability to assure good faith performance of the agreement. . . . [T]he Issuing Office will award an agreement only to those Offerors determined to be responsible in accordance with the most current version of Commonwealth Management Directive 215.9, Contractor Responsibility Program [(CRP).[20]]").

Likewise, Part I, Chapter 6(B)(2)(o) of the Procurement Handbook states that "[t]he Issuing Office: . . . [m]akes a determination of offerors' responsibility in accordance with Management Directive 215.9 Amended and Part I, Chapter 14 of this handbook."[21] *See also* Part I, Chapter 6(B)(10)(e)(1)(b) of the

---

[20] Section 321(6) of the Procurement Code states that DGS shall "[p]articipate in the management and maintenance of a [CRP] in coordination with the office of the Budget and other agencies as may be directed by the Governor." 62 Pa. C.S. §321(6). *See also* Section 327(b) of the Procurement Code, 62 Pa. C.S. §327(b) ("The Office of the Budget shall participate in the management and maintenance of a [CRP] in coordination with [DGS] and other agencies as may be directed by the Governor."). Management Directive 215.9 Amended from the Governor's Office establishes the policy, responsibilities, and procedures for the operation of the CRP.

[21] Part I, Chapter 14(C)(1) of the Procurement Handbook provides:

29

Procurement Handbook ("In order for an offeror to participate in the [BAFO] process, the issuing office must determine that the submitted and gathered financial and other information of the offeror demonstrates that the offeror possesses the financial and technical capability, experience and qualifications to assure good faith performance of the contract.").

Based on the foregoing, it is clear that the Director erred in denying Aetna's bid protests. The December 19th meeting between the Department's Deputy Secretary for OMAP and Deputy Chief Counsel in the Department's Office of General Counsel, and Centene's Chairman and CEO and Executive Vice President and the Chief Business Development Officer, which occurred after the bids had been opened, but before PHW was found to be a "responsible offeror" and before its proposal was determined to be responsive or the most advantageous, was not authorized by the Reissued RFP thereby violating the Procurement Code and the Procurement Handbook. *See, e.g.*, *Pepco*, 49 A.3d at 495 ("Based upon the numerous provisions of the RFP summarized above, we must conclude that the provisions of the RFP did not entitle Petitioner to engage in contract negotiations *before* the Department made a determination regarding whether Petitioner was a responsible offeror who submitted a responsive proposal or *before* the Department

---

Since the [Procurement] Code requires award to a "responsible" bidder or offeror, purchasing agencies are explicitly required to make an affirmative determination of a bidder or offeror's responsibility prior to award. Further, purchasing agencies are required to make a responsibility determination prior to requesting a [BAFO] when the [RFP] method of procurement is utilized. Determining responsibility is an affirmative duty, and the purchasing agency may not presume that all bidders or offerors are responsible.

30

made a determination as to which proposal was most advantageous.") (emphasis in original).[22]

As a result, the Department's order denying Aetna's bid protests will be reversed. *See American Totalisator Co.*, 414 A.2d at 1041 ("When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper."); *Hanisco v. Township of Warminster*, 41 A.3d 116, 123 (Pa. Cmwlth. 2012) ("A deviation from competitive bidding will not be countenanced even where there is no evidence of fraud or favoritism."). *See also* Section 1711.1(j) of the Procurement Code, 62 Pa. C.S. §1711.1(j) ("[I]f the court determines that the solicitation or award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract.").[23]

_____

[22] *See also Stapleton v. Berks County*, 593 A.2d 1323, 1331 (Pa. Cmwlth. 1991) ("We recognize that the procurement process for a complex contract such as the one negotiated in this case will necessitate some procedures which are not the norm. For this reason we do not find it objectionable that the county did not require bid or performance bonds in this case. . . . The events which transpired after the bids were opened are another matter. Private meetings and negotiations with some bidders to the exclusion of others before the contract is awarded is precisely the sort of favoritism and unfair advantage that *Harris*[ *v. Philadelphia*, 129 A. 460 (Pa. 1925)] and its progeny disdained."); *Conduit and Foundation Corp. v. City of Philadelphia*, 401 A.2d 376, 380 (Pa. Cmwlth. 1979) ("[W]e believe that the case falls, by analogy, under the line of cases raising the issue, not as to the city's discretion, but as to whether a bidder had a competitive advantage in preparing his bid because of the city's incomplete or misleading bid specifications or the city's having negotiated after the formal bid-opening.") (citations omitted).

[23] We find untenable the Department's assertion that Aetna has waived all claims of error in this regard by failing to address the Director's initial determination that it was not aggrieved under the Procurement Code. *See* Final Agency Determination at 16. However, the Director only determined that Aetna was not aggrieved with respect to the two Zones from which PHW withdrew its proposal, not addressing Aetna's aggrievement with respect to the three remaining Zones. *See id.* Nevertheless, Aetna has consistently challenged the process by which the selections were made in all five Zones under the Reissued RFP in the proceedings below, including the December 19th meeting, and its claims in this regard were addressed on the merits by the Director. *See id.* at 17-19. As a result, Aetna's claims in this regard have not been waived for purposes of appeal. *See*

*generally* Section 1711.1(g) of the Procurement Code, 62 Pa. C.S. § 1711.1(g) ("Within 15 days of the mailing date of a final determination denying a protest, a protestant may file an appeal with Commonwealth Court. Issues not raised by the protestant before the purchasing agency are deemed waived and may not be raised before the court."). Moreover, with respect to Aetna's request for a preliminary injunction, we held that the Department's failure to comply with the provisions of the Procurement Code constitutes "irreparable injury." *See Aetna Better Health of Pennsylvania Inc.*, slip op. at 27 ("Failure to coply with a statute is sufficiently injurious to constitute irreparable harm. *Wyland v. West Shore Sch. Dist.*, 52 A.3d 572, 583 (Pa. Cmwlth. 2012).").

Finally, based on our disposition of Aetna's claim with respect to the Department's violation of the Procurement Code, the Reissued RFP and the Procurement Handbook, we will not address the remaining claims in this appeal or the claims raised in our original jurisdiction. *See, e.g., Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 529 A.2d 1176, 1178 (Pa. Cmwlth. 1987) ("As the Commission points out, our Supreme Court has held with finality that the original jurisdiction of this Court is limited in matters involving Commonwealth agencies to those actions not within our appellate jurisdiction. We conclude that Peoples' Petition clearly sets forth the matter for our appellate review; therefore, we must sustain the demurrer. [Our ruling with respect to the demurrer makes it unnecessary for us to rule upon the Commission's other objections.]") (citation omitted).

Accordingly, the Department's order is reversed; Aetna's petition for review seeking declaratory, injunctive, and mandamus relief filed in our original jurisdiction, and the preliminary objections of the Department, PHW, Geisinger, and HPP, are dismissed as moot.

_____
MICHAEL H. WOJCIK, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Aetna Better Health of Pennsylvania, Inc., | : | |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 274 M.D. 2017 |
| | : | |
| Commonwealth of Pennsylvania, Department of Human Services, | : | |
| | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 11<u>th</u> day of <u>April</u>, 2018, the order of the Department of Human Services (Department) dated June 5, 2017, denying the bid protests of Aetna Better Health of Pennsylvania, Inc. (Aetna) with respect to the reissued Request for Proposal No. 06-15 is REVERSED; Aetna's petition for review seeking declaratory, injunctive, and mandamus relief filed in our original jurisdiction, and the preliminary objections of the Department, Pennsylvania Health & Wellness, Inc., Geisinger Health Plan, and Health Partners Plans, are DISMISSED as moot.

_____
MICHAEL H. WOJCIK, Judge